## MILLER CONSTRUCTION COMPANY, LLC, Respondent/Appellant,

v.

## PC CONSTRUCTION OF GREENWOOD, INC. and Safeco Insurance Company of America, Appellants/Respondents.

Appellate Case No. 2014–002749
Opinion No. 5440

Court of Appeals of South Carolina.

Heard May 4, 2016
Filed September 14, 2016

188

190

E. Wade Mullins III and Caitlin Creswick Heyward, both of Bruner Powell Wall & Mullins, LLC, of Columbia, for Appellants/Respondents.

David J. Brousseau, of McIntosh Sherard Sullivan & Brousseau, of Anderson, for Respondent/Appellant.

MCDONALD, J.:

In this breach of contract action seeking damages for failure to pay the balance due on a subcontract, Appellants/Respondents PC Construction of Greenwood, Incorporated (PC) and Safeco Insurance Company of America (Safeco) (collectively, PC) appeal the circuit court's denial of its Rule 59(e), SCRCP, motion to alter or amend, arguing the court erred in finding PC could not recover delay damages from Respondent/Appellant Miller Construction Company (Miller Construction). PC further argues the circuit court failed to consider the overwhelming evidence that Miller Construction caused delays on the project. On cross-appeal, Miller Construction argues the court erred in denying it prejudgment interest on its recovery for breach of contract. We affirm in part, reverse in part, and remand the question of prejudgment interest to the circuit court.

## FACTS AND PROCEDURAL HISTORY

This case arises from a construction project known as the Lander University Recreation, Wellness, and Sports Complex Initiative Field Construction (the Project) in Greenwood County. The Project involved the site work and construction of soccer, baseball, softball, and tennis facilities at the Lander University (Lander) Jeff May Sports Complex (the Complex). Lander put the Project out for bids and awarded it to general contractor PC pursuant to the South Carolina Consolidated Procurement Code.[1] On December 15, 2009, PC contracted to complete the work for $7,005,310.

PC subcontracted with Miller Construction[2] on December 17, 2009, for certain construction services, including but not limited to site work, grading, paving, and installation of a storm sewer for the Project (the Subcontract). Specifically, the Subcontract required Miller Construction to perform the work

---

1. S.C. Code Ann. §§ 11–35–10 to –5300 (2011 & Supp. 2015).

2. Miller Construction holds a Group 4 General Contractor's License in the grading subclassification with the Contractor's Licensing Board of the South Carolina Department of Labor, Licensing and Regulation. A contractor's license in the grading subclassification allows a licensee to perform "the soil preparation and rehabilitation of streets, roads, highways, railroad beds, building sites, parking lots, and storm sewers." S.C. Code Ann. § 40–11–410(2)(d) (2011).

set forth in two specification provisions: (1) Section 31–1000 Site Clearing, Demo and Erosion Control (the Site Clearing and Demo Specification) and (2) Section 33–4100 Site Storm Drainage (the Storm Drain Specification). The Site Clearing and Demo Specification required Miller Construction to demolish and remove the existing storm drain system along with all other subgrade site improvements. The Storm Drain Specification set forth the requirements for Miller Construction's installation of the storm drain pipes and manholes. The original amount of the Subcontract was $492,424.

During the course of the Project, Miller Construction submitted eighty-seven change orders to PC. Change Order #40 included a request to adjust the overall cost of the project as well as the schedule (Schedule) to include additional days due to delays caused by the discovery and removal process of nearly 10,000 tons of asbestos in early 2010. PC added additional days to the Schedule to address the asbestos issue.[3] The parties later agreed the asbestos was more widespread than originally anticipated.

Throughout the project, PC paid Miller Construction upon receipt of Miller Construction's pay applications. However, upon receipt of the final pay application in November 2011, PC withheld payment. At that time, Lander had not yet made final payment to PC due to a dispute over how much Lander owed PC. In spring 2013, Lander and PC reached an agreement regarding final payment.[4] Nevertheless, PC continued to withhold final payment from Miller Construction, alleging that delay damages caused by Miller Construction exceeded the balance PC owed on the Subcontract.

Miller Construction sued PC on May 25, 2012, seeking breach of contract damages for PC's failure to pay the balance due on the Subcontract. Miller Construction also asserted a cause of action on a payment bond against Safeco. On April 23, 2013, PC filed an amended answer and counterclaim, seeking damages due to Miller Construction's alleged delay of the Project. Prior to trial, PC further amended its answer, adding

---

3. PC does not claim any damages against Miller Construction for this delay.

4. Lander did not assess any damages for delays against PC.

an affirmative defense that Miller Construction was not properly licensed and, therefore, was barred from pursuing a claim for breach of contract. In late 2013, the circuit court denied the parties' cross-motions for summary judgment; a nonjury trial was held in November 2013.

Miller Construction's vice president, Michael Miller, testified that he understood and agreed to the terms of the Subcontract; he further acknowledged his understanding that timely completion of the Project was important and required under the Subcontract. He conceded that the Subcontract required Miller Construction to comply with the Schedule and the Schedule durations for Miller Construction's scope of work and that Miller Construction was required to provide the manpower and equipment necessary to meet the Schedule. Miller admitted the Subcontract required Miller Construction to submit a request for a change order if changed conditions required an increase in price or adjustment to the Schedule. Miller testified that by signing the Subcontract he agreed Miller Construction would be liable to PC for any damages that PC could show were a result of Miller Construction's failure to comply with any portion of the Schedule. He admitted that Miller Construction failed to notify PC at any time—other than in Change Order #40—that it was seeking additional time through a request for a change order under the terms of the Subcontract.

PC's project manager, Gary Piontek (the Project Manager), testified that after the asbestos issue was resolved, Miller Construction failed to maintain the Schedule, and PC encountered consistent and continuous problems with Miller Construction's failure to timely perform its work. The Project Manager and PC's site personnel communicated those concerns to Miller Construction throughout the Project at weekly meetings and by email. However, email correspondence from the Project Manager to Mike Miller supported Miller's contention that the delays were caused not by Miller Construction, but by PC's inability to coordinate its various subcontractors and by other issues not within Miller Construction's control.

PC's president, Randy Piontek, testified he got involved in an effort to get Miller Construction to comply with the Schedule. Randy Piontek admitted PC owed Miller Construction

$51,270.08 of the claimed $53,695.08; however, PC refused payment due to alleged delay damages exceeding that figure.

The Project Manager presented a detailed accounting of the delays allegedly caused by Miller Construction and the impact of those delays on PC's ability to complete the Project. In support of those claims, the Project Manager introduced PC's Activity Duration Schedule Analysis, which included a comparison of the original activity durations for each task with the actual time it took Miller Construction to complete them. PC claimed 145 days in total delays and arrived at its delay damage claim of $137,035.15 by multiplying the 145 days by its daily rate of $945.07. PC then presented John Bahr, president of a construction consulting firm, as its expert witness on scheduling, construction management, and contract administration services. Bahr testified he was familiar with the Project because his company had been retained to assist in establishing the Schedule. Bahr opined that Miller Construction failed to comply with its contractual obligations to perform and complete its activities in accordance with the Schedule and that the delay calculation of 145 days was reasonable. Moreover, Bahr testified as to the methodology used to calculate the daily rate, explaining that Miller Construction's lack of timely performance impacted PC's completion of the work and caused delay damages, including increased overhead, to PC.

On July 8, 2014, the circuit court issued a final order and judgment denying PC's claim for delay damages, finding PC owed Miller Construction $51,270.08, and ordering immediate payment by Safeco on the bond. The court declined to award Miller Construction prejudgment interest. Miller Construction and PC filed timely Rule 59(e), SCRCP, motions to alter or amend, which the circuit court denied.

## ISSUES ON APPEAL

PC raises four issues on appeal:

I. Did the circuit court err in finding PC could not recover damages against Miller Construction pursuant to the Subcontract because Lander never assessed any liquidated damages against PC?

II. Did the circuit court err in concluding Miller Construction did not cause any delays on the Project?

III. Did the circuit court err in finding Miller Construction was properly licensed to perform the subcontract work and, thus, permitted to bring an action pursuant to section 40–11–370(C) of the South Carolina Code (2011)?

IV. Did the circuit court err in determining Miller Construction was entitled to recover on the payment bond and in ordering immediate payment from the bond to Miller Construction?

Miller Construction raises one issue on cross-appeal:

I. Did the circuit court err in failing to award Miller Construction prejudgment interest when the principle balance owed is capable of being calculated as a sum certain?

## STANDARD OF REVIEW

"An action to construe a contract is an action at law reviewable under an 'any evidence' standard." *Pruitt v. S.C. Med. Malpractice Liab. Joint Underwriting Ass'n*, 343 S.C. 335, 339, 540 S.E.2d 843, 845 (2001). "In an action at law tried without a jury, an appellate court's scope of review extends merely to the correction of errors of law." *Temple v. Tec–Fab, Inc.*, 381 S.C. 597, 599–600, 675 S.E.2d 414, 415 (2009). "The Court will not disturb the trial court's findings unless they are found to be without evidence that reasonably supports those findings." *Id.* at 600, 675 S.E.2d at 415. "The rule is the same whether the judge's findings are made with or without, a reference." *Townes Assocs., Ltd. v. City of Greenville*, 266 S.C. 81, 86, 221 S.E.2d 773, 775 (1976). "The judge's findings are equivalent to a jury's findings in a law action." *Id.*

## PC'S ISSUES ON APPEAL

### I. Damages

PC argues the circuit court erred in finding it could not recover damages against Miller Construction under the Subcontract because Lander never assessed any liquidated damages against PC. We disagree.

"The cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as

determined by the contract language." *Whitlock v. Stewart Title Guar. Co.*, 399 S.C. 610, 614, 732 S.E.2d 626, 628 (2012). "Where the contract's language is clear and unambiguous, the language alone determines the contract's force and effect." *Id.* at 615, 732 S.E.2d at 628. "A contract is ambiguous only when it may fairly and reasonably be understood in more ways than one." *Jordan v. Sec. Grp., Inc.*, 311 S.C. 227, 230, 428 S.E.2d 705, 707 (1993). "It is a question of law for the court whether the language of a contract is ambiguous." *S.C. Dep't of Nat. Res. v. Town of McClellanville*, 345 S.C. 617, 623, 550 S.E.2d 299, 302–03 (2001).

> PC argues the circuit court erred in the following finding: Pursuant to the subcontract, PC cannot recover any type of liquidated damages against Miller as PC was never assessed with liquidated damages or damages for delay from [O]wner. As such, taking the evidence in a light most favorable to PC, it is unable to sustain a cause of action for breach of contract against Miller for delay damages. Miller's motion for involuntary non-suit/directed verdict as to this cause of action is hereby granted.

PC further argues that the terms of the Subcontract are clear and unambiguous with respect to Miller Construction's obligations to timely perform its scope of work and contends the Subcontract repeatedly references that "time is of the essence" regarding performance and completion. Conversely, Miller Construction argues the circuit court properly denied PC's counterclaim for delay damages when Lander did not assess any damages against PC for delays and PC agreed to accept additional compensation from Lander due to delays not caused by PC or its subcontractors.

Miller Construction submits that Article 3 of the Subcontract is controlling as to payment by PC to Miller Construction during the progress of the Project and with respect to final payment. Article 3 provides:

> ARTICLE 3: SUBCONTRACT PRICE AND PAYMENT
>
> . . .
>
> e. CONDITIONS OF PAYMENT. Within ten (10) days after receipt by [PC] from [Lander] of monies in payment of Subcontractor's application for payment, receipt of such payment from [Lander] being an express condition prece-

dent to [PC]'s obligation to pay Subcontractor, [PC] shall pay the same over to Subcontractor less retainage. Notwithstanding any contrary provision elsewhere in this Subcontract, **[PC] may delay payment of all or any portion of Subcontractor's application for payment in order to reasonably determine that Subcontractor's Work for which payment is requested** has been properly performed and is in place, that sufficient funds remain available to complete Subcontractor's Work, **that Subcontractor's Work will be completed as required by the Job Schedule,** that Subcontractor's application for payment and accompanying affidavits and waivers are true and correct in fact, and that all other requirements of this Subcontract have been satisfied relative to Subcontractor's Work for which payment is sought. **When such determinations have been made to [PC]'s satisfaction, [PC] will make payment in accordance with Subcontractor's application as provided for in this Subcontract.** No such determination or payment shall relieve Subcontractor from its obligations under this subcontract, nor stop [PC] from subsequently asserting Subcontractor's failure to satisfy said obligations.

. . .

g. FINAL PAYMENT

. . .

iii. CONDITIONS OF FINAL PAYMENT. Final payment of the balance of the Subcontract Price due shall be made to Subcontractor:

1. when appropriate certification and final approval thereof have been received as provided in the Contract Documents; and

2. after receipt by [PC] of final payment from [Lander], such receipt being an express condition precedent to [PC]'s obligation to make final payment to the Subcontractor. Subcontractor's acceptance of final payment shall constitute a waiver by Subcontractor of all claims relating to Subcontractor's Work except such claims as have been previously identified and made in writing and fully and properly pre-

served and pursued pursuant to the terms of this Subcontract.

(emphasis added).

PC and Miller Construction agree that Article 6 is relevant as to delays and claims relating to Lander.

ARTICLE 6: CHANGES, FIELD ORDERS, CLAIMS, AND DELAYS

a. CHANGES. Without nullifying this Subcontract or any bond given pursuant to this Subcontract, [PC] may, in writing, direct the Subcontractor to make changes to the Subcontractor's Work, which changes are within the scope of this Subcontract. Within ten (10) days of [PC]'s directive or if the Contract Documents require notice to be given by [PC] to [Lander] in less than ten days, Subcontractor shall comply with the notice requirements of the Contract Documents by giving notice and a written proposal to [PC] within such time as to enable [PC] to give notice to [Lander] or to comply with any other notice requirements of the Contract Documents. FAILURE OF THE SUBCONTRACTOR TO SUBMIT A WRITTEN PROPOSAL WITHIN THE TIME PROVIDED HEREIN, OR TO PROVIDE A WRITTEN NOTICE WITHIN THE TIME REQUIRED HEREIN, SHALL CONSTITUTE A WAIVER OF THE SUBCONTRACTOR'S RIGHT TO AN ADJUSTMENT OF THE SUBCONTRACT PRICE OR JOB SCHEDULE OR, WHERE A CREDIT IS INVOLVED, SUBCONTRACTOR ACCEPTS THE AMOUNT DETERMINED BY [LANDER], ARCHITECT AND/OR [PC]. Any adjustments to the Subcontract Price or Job Schedule, if any, shall be set forth in a written Subcontract Change Order.... THERE WILL BE NO ADJUSTMENT TO THE SUBCONTRACT PRICE OR JOB SCHEDULE WHICH ARE NOT ORDERED IN WRITING BY [PC] AND SIGNED BY THE PROJECT MANAGER, Gary Piontek....

. . .

d. CLAIMS RELATING TO [LANDER].... Subcontractor shall only be entitled to an adjustment to the Subcontract Price or Job Schedule, for performing and completing that portion of Subcontractor's Work associated with any claim for which [Lander] is or may be liable, upon the same

terms and conditions as any extension of time or additional compensation is allowable to [PC] under the Contract Documents, and only to the extent actually allowed and paid to [PC] by [Lander], receipt of payment from [Lander] being an express condition precedent to [PC]'s obligation to pay Subcontractor. **Any decision of [Lander] or Architect with respect to such claims which, under the terms of the Contract Documents, is binding on [PC], and any decision in arbitration or litigation between [Lander] and [PC] which becomes final and binding on [PC] shall likewise be final and binding on Subcontractor.**

. . .

e. DELAY. If the progress of Subcontractor's Work is substantially delayed without the fault or responsibility of Subcontractor, then the Job Schedule shall be adjusted accordingly, but only to the extent an extension of time is obtained by [PC] from [Lander] under the terms of the Contract Documents; provided that Subcontractor must give written notice of delay to [PC] within such time as to enable [PC] to give [Lander] any notices required by the Contract Documents, but in any event, no later than five (5) days after the occurrence of the event claimed to be a substantial delay, otherwise the right to such an adjustment to the Job Schedule is waived. . . . **If the Contract Documents provide for liquidated or other damages for delay and such damages are so assessed against [PC], then [PC] may assess same against Subcontractor in proportion to Subcontractor's share of the responsibility for such delay as determined by [PC]. Subcontractor shall also be liable for all additional damages [PC] may incur as a result of Subcontractor's failure to complete the Subcontractor's Work or any portion thereof in accordance with the Job Schedule, including direct costs, liquidated damages and/or [PC's] extended overhead.**

(emphasis added).

■ PC correctly contends on appeal that the Subcontract specifically allows PC to assess delay damages, including damages for extended overhead and liquidated damages, against Miller Construction. However, the Subcontract classifies such damages as *"additional* damages." Further, the record reflects that after completion of the Project, PC and

Lander were involved in a dispute regarding final payment. PC agreed to and accepted an additional payment from Lander of approximately $120,000 for "extended general conditions" or "overhead" due to roughly 120 days of delays not caused by PC or its subcontractors. Pursuant to the terms of the Subcontract, "[a]ny decision of [Lander] or Architect with respect to such claims which, under the terms of the Contract Documents, is binding on [PC], and any decision in arbitration or litigation between [Lander] and [PC] which becomes final and binding on [PC] shall likewise be final and binding on Subcontractor." Moreover, Randy Piontek acknowledged at trial that Lander never assessed any damages against PC due to delays. The following exchange occurred:

Q: Do you have any documents, whatsoever, that say that liquidated damages were assessed by Lander University or Lander Foundation against [PC]?

A: There was a letter sent by Lander that indicated that they expected liquidated damages to be assessed against the first phase of the project. As a part of our settlement, the liquidated damages were included.

Q: My question though, sir, was[,] were they ever actually assessed? You stated that you expected them to be or Lander expected them to be assessed. My question was, were they actually ever assessed?

A: I guess, technically no.

Q: And under your contract, you can only assess liquidated damages against Miller if they're assessed by Lander, correct?

A: Correct.

In light of Randy Piontek's testimony and the contract language itself, and under our "any evidence" standard of review, we find the circuit court properly determined that PC could not recover damages against Miller Construction pursuant to the terms of the Subcontract. *See Pruitt*, 343 S.C. at 339, 540 S.E.2d at 845 ("An action to construe a contract is an action at law reviewable under an 'any evidence' standard."); *Temple*, 381 S.C. at 599–600, 675 S.E.2d at 415 ("The Court will not disturb the trial court's findings unless they are found to be without evidence that reasonably supports those findings."). Although the Subcontract specifically allowed PC to

join Miller Construction as a party to any action against Lander, PC elected not to do so and then agreed to and accepted final payment from Lander without any input from Miller Construction. Significantly, the circuit court noted it "would have additionally found that PC did not meet its burden of proof on this [the delay] issue. The evidence was clear that Miller did not cause any delays on this project." Accordingly, we affirm the circuit court findings as to this issue.

## II. Delays

PC argues the circuit court erred in concluding Miller Construction did not cause any delays on the project. We disagree.

Throughout the Project, PC paid Miller Construction upon its applications for payment. In January 2011, PC's Project Manager emailed Michael Miller acknowledging Miller Construction was on-site when allegedly no other contractors were. On January 27, 2011, the Project Manager communicated a work request and concluded his email with the comment, "Miller has been a great sub, [w]hich I will gladly recommend." In April 2011, the Project Manager again emailed Michael Miller, this time to confirm that Miller Construction was doing what was necessary to keep the Project on track. PC also confirmed that Lander had not charged it for liquidated damages due to any alleged delays. In other correspondence, the Project Manager communicated his timeliness concerns, but it was unclear whether these delays were the fault of Miller Construction or the general contractor's inability to coordinate the work of its various subcontractors in light of Project setbacks caused by heavy rains and other issues which were not the fault of Miller Construction. Moreover, Bradley Grogan, Assistant Athletic Director for the Complex, and Frank Sells, II, ground superintendent at Lander, both testified that Miller Construction kept the Project running, as best it could, in accordance with the job schedule. At the completion of the Project in November 2011, PC admitted it owed Miller Construction approximately $15,000 as well as its retainage of approximately $51,000. PC again made no mention of any delays or damages at the time of Miller's final payment application.

Our review of the record reveals Miller Construction presented evidence establishing it did not cause the delays on the Project. Therefore, under our deferential "any evidence" standard of review, we hold there is evidence reasonably supporting the circuit court's findings. *See Pruitt*, 343 S.C. at 339, 540 S.E.2d at 845 ("An action to construe a contract is an action at law reviewable under an 'any evidence' standard."); *Temple*, 381 S.C. at 599–600, 675 S.E.2d at 415 ("The Court will not disturb the trial court's findings unless they are found to be without evidence that reasonably supports those findings."). Accordingly, we affirm the circuit court's findings as to the Project delays.

### III. Licensing

 PC next contends that the circuit court erred in finding Miller Construction was properly licensed to perform the work pursuant to the Subcontract and, thus, section 40–11–370(C) of the South Carolina Code barred Miller Construction's action. We disagree.

Pursuant to section 40–11–370(C), "An entity which does not have a valid license as required by this chapter may not bring an action either at law or in equity to enforce the provisions of a contract." Section 40–11–410(2) contains a "General Contractors–Highway" licensing classification which includes, in relevant part, the following subclassifications:

(d) "Grading" which includes the **soil preparation and rehabilitation** of streets, roads, highways, railroad beds, building sites, parking lots, and **storm sewers**. This subclassification also includes work under the subclassification of Highway Incidental.

(e) "Highway Incidental" which includes highway work for grooving, milling, rehabilitating, and installing guardrails, gutters, highway signs, pavement marking, and painting.

S.C. Code Ann. § 40–11–410(2)(d)–(e) (2011) (emphasis added).

PC argues that pursuant to section 40–11–410(3)(c), Miller was required to hold a "General Contractors—Public Utility" license—rather than a "General Contractors—Highway" li-

cense—which includes the subclassification "Water and Sewer Lines" to perform work on the Project's storm sewer system.[5]

At the outset of our analysis, we note—as the circuit court did—that "[i]t is unlawful for an owner, a construction manager, a **[general] contractor**, or another entity with contracting or hiring authority on a construction project to divide work into portions so as to avoid the financial or other requirements of this chapter as it relates to license classifications or subclassifications or license groups, or both."

S.C. Code Ann. § 40–11–300(A) (2011) (emphasis added). Citing to section § 40–11–270(E) (2011), the circuit court also recognized that "[t]he licensee is fully responsible for any violations of this chapter resulting from the actions of unlicensed subcontractors performing work for the licensee."

▮▮▮ The circuit court explained that "if PC hired unlicensed subcontractors to perform work on this project[,] it would be in violation of the law. The purpose of protecting the public interest by denying enforceability does not exist when dealing with claims between contractors." *Teseniar v. Prof'l Plastering & Stucco, Inc.*, 407 S.C. 83, 97, 754 S.E.2d 267, 274 (Ct. App. 2014); *see also Kennoy v. Graves*, 300 S.W.2d 568, 570 (Ky. Ct. App. 1957) ("The statute involved, and similar ones, are designed to protect the public from being imposed upon by persons not qualified to render a professional service. The reason for the rule denying enforceability does not exist when persons engaged in the same business or profession are dealing at arm['s] length with each other. In the case before us, appellant was in a position to know, and did know, the qualifications of appellee. No reliance was placed upon the existence of a license, as presumptively would be the case if appellee was dealing with the general public."). Moreover,

---

**5.** The "Water and Sewer Lines" subclassification includes "construction work on water mains, water service lines, water storage tanks, sewer mains, sewer lines, lift stations, pumping stations and appurtenances to water storage tanks, lift stations, pumping stations, pavement patching, backfill, and erosion control as a part of construction, and ... includes connection at the building of all lines to the appropriate lines contained in commercial structures, **installation and repair of a project involving manholes, the laying of pipe for storm drains and sewer mains**, all necessary connections, and excavation and backfilling, and concrete work incidental thereto." S.C. Code Ann. § 40–11–410(3)(c) (2011) (emphasis added).

during the course of the Project, there was no claim that Miller Construction was not licensed to perform this work, and there is no evidence that any permitting agency ever attempted to stop work on the Project due to licensing issues.

Although Defendants' Exhibit 1 illustrates that the Project involved the installation of manholes and the laying of pipe for storm drains, PC's Project Manager testified that a new storm sewer system was installed and joined to an existing storm sewer system. Additionally, PC's expert testified Miller Construction's scope of work did not involve rehabilitation of the storm sewer system as contemplated in the grading classification.

However, the legislature included the term "rehabilitation" within the grading subclassification without any language excluding installation and demolition of storm sewer lines. *See* S.C. Code Ann. § 40–11–410(2)(d) (2011). "Questions of statutory interpretation are questions of law, which we are free to decide without any deference to the court below." *CFRE, LLC v. Greenville Cty. Assessor*, 395 S.C. 67, 74, 716 S.E.2d 877, 881 (2011). "The cardinal rule of statutory construction is a court must ascertain and give effect to the intent of the legislature." *State v. Elwell*, 403 S.C. 606, 612, 743 S.E.2d 802, 806 (2013). "What a legislature says in the text of a statute is considered the best evidence of the legislative intent or will." *Id.* "Where the statute's language is plain and unambiguous, and conveys a clear and definite meaning, the rules of statutory interpretation are not needed and the court has no right to impose another meaning." *Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000). "Under this rule, a statute restricting the common law will 'not be extended beyond the clear intent of the legislature.' " *Grier v. AMISUB of S.C., Inc.*, 397 S.C. 532, 536, 725 S.E.2d 693, 696 (2012) (quoting *Crosby v. Glasscock Trucking Co.*, 340 S.C. 626, 628, 532 S.E.2d 856, 857 (2000)). "Statutes subject to this rule include those which 'limit a claimant's right to bring suit.' " *Id.* (quoting 82 C.J.S. *Statutes* § 535).

"When confronted with an undefined term, the court must interpret it in accordance with its usual and customary meaning." *Hughes v. W. Carolina Reg'l Sewer Auth.*, 386 S.C. 641, 646, 689 S.E.2d 638, 641 (Ct. App. 2010). "However, this

court will consider the language of the particular clause in which the term appears and also its meaning in conjunction with the purpose of the whole statute." *Id.*; *see also Hinton v. S.C. Dep't of Prob., Parole & Pardon Servs.*, 357 S.C. 327, 332–33, 592 S.E.2d 335, 338 (Ct. App. 2004) ("Terms must be construed in context and their meaning determined by looking at the other terms used in the statute.").

The term "rehabilitation" is not defined in the statute. Therefore, we must look to the common definition of "rehabilitate," which is "to bring (someone or something) back to a good condition." *Rehabilitate*, MERRIAM-WEBSTER.COM, http:// merriam-webster.com/dictionary/rehabilitate (last visited Apr. 25, 2016). Rehabilitate is also defined as "to put back in good condition; reestablish on a firm, sound basis." *Rehabilitate*, YOURDICTIONARY.COM, http://www.yourdictionary.com/ rehabilitate#websters (last visited Apr. 25, 2016).

Miller testified that Miller Construction demolished the existing storm drainage system that was previously a parking lot. "This site was one time a shopping center, so we removed it. We went back in, installed new storm drainage[, which w]e tied to some of the existing boxes that [were] there[,] and also ran new piping from there to some of existing boxes." Therefore, the evidence supports the circuit court's finding that "the legislature intended to keep such a broad term like rehabilitation within the context of the statute." Accordingly, we affirm the circuit court as to this issue.

## IV. Payment Bond

■ PC argues the circuit court erred in determining Miller Construction was entitled to recover on its claim under the payment bond and in ordering immediate payment to Miller Construction. We find this issue is not preserved for our review.

PC contends Miller Construction erroneously argued that its suit on the payment bond was brought pursuant to section 29–5–440 of the South Carolina Code [6] and that the circuit

---

**6.** "Every person who has furnished labor, material, or rental equipment to a bonded contractor or its subcontractors in the prosecution of work provided for in any contract for construction, and who has not been paid in full therefor before the expiration of a period of ninety days

court erroneously referenced the matter as brought pursuant to section 29–5–440. PC further argues that because the bond was issued for a public project and the bid process occurred in accordance with the South Carolina Procurement Code, the action on the bond could only be brought pursuant to section 11–35–3030.[7] Our review of the record reveals that PC raised this issue for the first time in its Rule 59(e), SCRCP, motion to alter or amend. Accordingly, we find this issue is not preserved for appellate review. *See Patterson v. Reid*, 318 S.C. 183, 185, 456 S.E.2d 436, 437 (Ct. App. 1995) ("A party cannot for the first time raise an issue by way of a Rule 59(e) motion which could have been raised at trial.").

## MILLER CONSTRUCTION'S ISSUE ON CROSS-APPEAL

### I. Prejudgment Interest

Miller Construction argues the circuit court erred in failing to award prejudgment interest on its damages claim because the principle balance owed is capable of being calculated as a sum certain. We agree.

▮▮▮▮ "The law permits the award of prejudgment interest when a monetary obligation is a sum certain, or is capable of being reduced to certainty, accruing from the time payment may be demanded either by the agreement of the parties or

---

after the day on which the last of the labor was done or performed by him or material or rental equipment was furnished or supplied by him for which such claim is made, shall have the right to sue on the payment bond for the amount, or the balance thereof, unpaid at the time of the institution of such suit and to prosecute such action to final execution and judgment for the sum or sums justly due him.... This section shall apply to any payment bond, whether statutory, public, common law, or private in nature, that is issued in connection with a construction project or other improvements to real property within South Carolina where such payment bonds are not otherwise required or governed by any other section of the South Carolina Code of Laws." S.C. Code § 29–5–440 (2014 & Supp. 2015).

7. In any event, section 11–35–3030 provides in pertinent part that "written notice to the bonded contractor must generally conform to the requirements of Section 29–5–20(B)...." S.C. Code § 11–35–3030 (2)(c) (Supp. 2015). Section 29–5–20(B) sets forth the required notice content for the lien of a laborer, mechanic, subcontractor, or material-man, as well as the aggregate limits on such. S.C. Code § 29–5–20 (B) (2007).

the operation of law." *Historic Charleston Holdings, LLC v. Mallon*, 381 S.C. 417, 435, 673 S.E.2d 448, 457 (2009); *see also* S.C. Code Ann. § 34-31-20(A) (Supp. 2015) ("In all cases of accounts stated and in all cases wherein any sum or sums of money shall be ascertained and, being due, shall draw interest according to law, the legal interest shall be at the rate of eight and three-fourths percent per annum."). "Generally, prejudgment interest may not be recovered on an unliquidated claim in the absence of agreement or statute." *Historic Charleston Holdings, LLC*, 381 S.C. at 435, 673 S.E.2d at 457. "The fact that the amount due is disputed does not render the claim unliquidated for purposes of awarding prejudgment interest." *Id.* "Rather, the proper test is 'whether or not the measure of recovery, not necessarily the amount of damages, is fixed by conditions existing at the time the claim arose.'" *Id.* (quoting *Butler Contracting, Inc. v. Court Street, LLC*, 369 S.C. 121, 133, 631 S.E.2d 252, 259 (2006)).

"The right of a party to prejudgment interest is not affected by rights of discount or offset claimed by the opposing party. It is the character of the claim and not the defense to it that determines whether prejudgment interest is allowable." *Butler Contracting, Inc.*, 369 S.C. at 133–34, 631 S.E.2d at 259. "A judgment debtor is required to pay interest on his debt as compensation for his continued retention and use of the creditor's money beyond the date payment was due." *Id.* at 134, 631 S.E.2d at 259.

In *S. Welding Works, Inc. v. K & S Constr. Co.*, 286 S.C. 158, 332 S.E.2d 102 (Ct. App. 1985), this court found the circuit court properly disallowed prejudgment interest in an action on an account stated, reasoning:

Although *Southern* pleaded an account stated, it apparently failed to prove the elements of an account stated at trial. The essential elements of an account stated are (1) that the account is actually stated; and (2) that the parties either expressly or impliedly agreed that it is a true statement and is due to be paid then or at some other specified time. Southern proved the account was actually stated. However, in its answer K & S specifically denied the parties ever agreed it was a true account. Consequently, the burden was on Southern to prove agreement to the account as stated. In

the record before us there is no evidence that K & S expressly or impliedly agreed there was at any specified time due to Southern the sum of money specified in the account. Likewise, we find no evidence that the parties agreed to a contract price for the repairs before they were performed. Accordingly, prejudgment interest was properly disallowed.

*Id.* at 164–65, 332 S.E.2d at 106 (citation omitted).

Here, Miller Construction sought damages for breach of contract for failure to pay the balance due on the Subcontract, alleging it is owed the principle balance of $53,695.08 and affirmatively sought prejudgment interest. At trial, Randy Piontek admitted the balance on the contract with Miller Construction was $51,270.08 of the $53,695.08 claimed under the contract, thus, offsetting PC's alleged delay damages. Although Miller Construction initially sought prejudgment interest of $7,586.09, it presented a revised calculation of $10,691.35 in its Rule 59(e), SCRCP, motion to alter or amend. Based on our review of the record, we find Miller Construction is entitled to prejudgment interest as it proved the essential elements of an account stated.

However, we agree with PC that there are insufficient findings in the record on appeal to determine at what point a sum certain claim accrued. Miller Construction asserts prejudgment interest began to accrue on March 29, 2012. In its final order and judgment, the circuit court found that final payment from Lander was an express condition to PC's obligation to issue final payment to Miller Construction, which occurred in spring 2013. As such, there could not have been a final sum certain until spring 2013, approximately one year after the March 29, 2012 date set forth by Miller Construction. Thus, we remand this matter to the circuit court to determine when the sum certain accrued under the contract and to assess the appropriate prejudgment interest.

**CONCLUSION**

Based on the foregoing analysis, we affirm the following findings: PC could not recover delay damages against Miller Construction because Lander never assessed liquidated damages against PC; PC did not meet its burden of proof on the

delay issue; and Miller Construction was properly licensed and able to seek payment.

PC's additional payment bond argument is not preserved for appellate review. We reverse the circuit court's decision declining to award prejudgment interest to Miller Construction and remand this matter for the circuit court to determine when the sum certain accrued and to assess prejudgment interest.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

LOCKEMY, C.J., and WILLIAMS, J., concur.